HARRY HARRIS & CO. v. UNITED STATES.

No. 46287.

Court of Claims.

Jan. 6, 1947.

MADDEN, Judge, dissenting in part.

Milton Carr Ferguson, of Washington, D. C., for plaintiff.

Kendall M. Barnes, of Philadelphia, Pa., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, JONES, WHITAKER, LITTLETON and MADDEN, Judges.

WHALEY, Chief Justice.

The plaintiff is a dealer in iron and steel, its operations including scrap and salvage material, as well as new steel products.

In the early part of December 1941, plaintiff was advised by the Forbes Steel Co. of Monessen, Pa., that it had for sale approximately 194,000 pounds of $\frac{17}{32}''$ wire rods and 119,400 pounds of $\frac{1}{2}''$ wire rods, all commercial grade low carbon steel and new.

The plaintiff in turn sought a purchaser, was successful, and received an order from Knickerbocker Export Co. for the entire lot at a price of $5.50 per hundredweight F. A. S. New York, the Knickerbocker Export Co. desiring to fill an order from an Argentinian customer.

The plaintiff thereupon ordered the proffered rods from the Forbes Steel Co., and at a price which amounted approximately to $5.05 per cwt. f. o. b. New York City.

The rods were shipped to the plaintiff at New York City and arrived at Weehawken December 24, 1941. The plaintiff paid the Forbes Steel Co. December 30, 1941, and the rods were the plaintiff's.

The plaintiff tendered them to the Knickerbocker Export Co., but the sale to that company fell through because they could not be shipped to the Argentinian customer. The obstacle to overseas shipment was, of course, the war situation, lack of shipping space, and finally the necessity of a special export license. The requirement of a special export license did not come until January 1942, but the shipping situation itself was in the meantime sufficient to prevent exportation.

The Knickerbocker Export Co. was unable to secure any export license, and the material was on plaintiff's hands.

. But plaintiff did not give up hope that an export license would be secured and that the Office of Price Administration, then in control of prices, would approve the Knickerbocker price of $5.50 per cwt. In addition to the matter of resale price to the Knickerbocker Export Co., the plaintiff was concerned about the freight rates to New York and the storage there. The freight rates and the storage rates were less for material to be exported than material used for domestic purposes. If plaintiff had to dispose of the rods here in the United States, the freight and storage rates would be higher.

But the War Production Board, for very good reasons, would not allow the material to remain stored at the Port of New York, where the railroad company had placed it in ground storage.

The Government proceeded to ship the material to the Army Holding and Reconsigning Depot at Voorheesville, N. Y., where it was replaced in ground storage for plaintiff's account, such transportation and storage being without cost to the plaintiff.

On August 25, 1942, The Abbott Ball Co., of Hartford, Connecticut, ordered from plaintiff 80,000 pounds of the $\frac{1}{2}''$ rods, for shipment to the Atlantic Wire Co., Branford, Conn., at "Maximum OPA price approx. $0.05 per lb."

The commanding officer at Voorheesville required payment of the in-bound freight to New York and the storage there, before he would release the Abbott Ball order. The plaintiff thereupon paid such freight and storage, and on October 16, 1942, 115,271 pounds of $\frac{1}{2}''$ rods were

shipped to The Atlantic Wire Co. at Branford, Conn. This was 35,271 pounds in excess of the order (a mistake in shipment), but the Abbott Company accepted 82,171 pounds, and the residue, 33,100 pounds, remained with the Atlantic Company until September 1943, when it was shipped to plaintiff at Kearny, New Jersey, at plaintiff's expense.

There was thus left at the Voorheesville depot 4,129 pounds of ½" rods and 194,000 pounds of 17⁄32" rods, a total of 198,129 pounds, which, however, was scaled by the Government at 199,000 pounds, an overage of 871 pounds, and the Government requisitioned the lot of 199,000 pounds at the Voorheesville depot February 20, 1943.

For the requisition the defendant allowed the plaintiff $1,029.66, being at the rate of a fraction over 51.7 cents per cwt. So much of accumulated freight and storage charges at the Port of New York as remained unpaid amounted to $1,004.33. This the defendant has paid to the railroad company, plaintiff consenting thereto, and no part of the balance of $25.33 has ever been paid to the plaintiff, although 50% was tendered under the act of October 10, 1940, plaintiff refusing to accept the offer.

The sole question to be determined, therefore, is the amount of compensation the plaintiff is entitled to for the taking.

The value allowed by the defendant was a scrap value. But these rods were more than scrap. It is true that they had deteriorated through rusting, being left out in the weather for some months, but they could be processed for certain uses, and processing is not melting. By processing they could have been converted into spikes or used for concrete reinforcing steel.

In August 1942, the Abbott Ball Company made an offer of $5 per cwt. Delivery to that company was in the following October, and the Office of Price Administration allowed the sale at $3.47 per cwt. delivered at Hartford.

The requisition was in February 1943, at 51.7 cents per cwt. at Voorheesville.

In November 1943, 33,100 pounds were sold to Molla, Inc., at $2.75 per cwt. plus 75 cents per cwt. for straightening, cutting, and handling. The $2.75 was an OPA price.

The original sale price, back in December 1941, was $5.50 per cwt., new. The wire rods had substantially deteriorated, as would necessarily be the case out in the open with ordinary weather conditions.

The fair and reasonable value found, at the time and place of taking (Arkansas Valley Ry. v. United States, Ct.Cl., 68 F.Supp. 727; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55), is $3.23 per hundred pounds, which amounts to $6,427.70 on 199,000 pounds. The taking itself cannot be considered as scrapping, although the requisitioning agency, the Government, might use the material for scrap. The taking cannot have the effect of lessening values. To this effect see Arkansas Valley Ry. v. United States, supra.

The plaintiff is entitled to recover as just compensation $5,423.37, being the principal sum of $6,427.70 less freight and storage of $1,004.33 admittedly due and paid to the railroad company, and in addition thereto, also as just compensation, four percent per annum on $5,410.71 from February 20, 1943, down to the date of payment of judgment. The difference between $5,423.37 and $5,410.71 is $12.66 which the plaintiff could have accepted without impairing its right to recover the balance. Act of October 10, 1940, 54 Stat. 1090, 50 U.S.C.A.Appendix, §§ 711–713.

Judgment in favor of plaintiff as indicated. It is so ordered.

JONES, WHITAKER, and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting in part).

I agree with the decision of the court that the material requisitioned by the Government was not scrap, and that the plaintiff was not, therefore, tendered just compensation. I think, however, that the court's award of $3.23 per cwt. is erroneous. The OPA ceiling price for wire rods seems to have been about $2.75 per cwt. For the reasons given in my dissenting

opinion in the case of Arkansas Valley Railway v. United States, supra, I think the ceiling price is the measure of just compensation.